WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-24-08211-TUC-RM (MAA) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Venicia Monique Bohn, | |
| Defendant. | |

Pending before the court is Defendant's Motion to Suppress Evidence [Doc. 46]. The Government filed a Response [Doc. 51]. Defendant did not file a Reply. An evidentiary hearing was held on August 26, 2025 [Doc. 59]. Defendant was present and represented by counsel. Corporal Nicholas Carpenter of the City of Benson Police Department testified for the government. Private investigator Raymundo Pacheco testified for Defendant. Government's Exhibits A-N and H1 were admitted into evidence by stipulation of the parties, as were Defendant's Exhibits A-N.

Defendant is charged by indictment with one count of Conspiracy to Transport Illegal Aliens for Profit and two counts of Transporting Illegal Aliens for Profit in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i), and 8 U.S.C. § 2. Doc. 25. The Motion [Doc. 46] argues Cpl. Carpenter acted without reasonable suspicion in violation of Defendant's Fourth Amendment rights, first in stopping Defendant's vehicle for an alleged traffic violation and then in detaining Defendant for an alien-smuggling investigation. Defendant requests suppression of all evidence from the

stop and alien-smuggling investigation. The Government argues reasonable suspicion existed for both the stop and the alien-smuggling investigation.

Having considered the briefing, testimony, exhibits and arguments, the Magistrate Judge recommends the Motion be denied. Based on the totality of the circumstances, reasonable suspicion existed for both the traffic stop and the alien-smuggling investigation.

**The Stop and Investigation**

Cpl. Carpenter has been with the Benson Police Department for eight years working in and around Benson. Hearing Transcript ("HT") at 10:4-10. As a corporal, he is a first-line leader for a squad of officers. HT 10:9-10, 10:20-21, 11:5, 13:13-14. He also spent 10 months as an officer with the Arizona Department of Public Safety, working in the Wilcox area northeast of Benson on the I-10 corridor. HT 10:23-11:1, 13:10-12.

According to Cpl. Carpenter, Benson is a "hotbed" for human smuggling. HT 13:1-2. State Route 80 ("SR-80") runs from the United States-Mexico border through Benson to Interstate 10 ("I-10") at the west end of Benson. HT 13:3-4. SR-80 connects to westbound I-10 via the 303 onramp and is used by smugglers coming from and returning to the Tucson and Phoenix areas. HT 25:18-21; Defendant's Exhibit I. Due to smuggling activity in the area, Cpl. Carpenter received specialized training in human smuggling. HT 12:17-13:4.

As a Benson police officer, Cpl. Carpenter has authority to investigate alien smuggling but also may, and sometimes does, contact Border Patrol to investigate suspected alien smuggling. HT 14:9-11, 60:2-12. He estimates that, within the last year, he made 40-50 stops for alien smuggling and 100-plus stops for traffic violations. HT 13:19-25.

On October 21, 2024, at approximately 9:00 p.m., Cpl. Carpenter was on duty in his patrol vehicle at SR-80 and Ocotillo Road in Benson, perpendicular to and facing SR-80 with the vehicle's headlights on in bright mode. HT 14:18-21, 62:18-23. According to Cpl. Carpenter, a white sedan passed his position traveling on SR-80 toward I-10. HT 15:1-2.

According to Cpl. Carpenter, he was able to observe the vehicle broadside as it

1    passed.  HT 62:20-23.  He testified he saw that the vehicle's back end was riding lower
2    than the front, and that the vehicle had a temporary registration tag.  HT 15:2-3, 62:20-23.
3    In Cpl. Carpenter's training and experience, a heavily laden vehicle and a temporary
4    registration tag are indicators of human smuggling, suggesting an excess load and that the
5    driver may be trying to conceal her identity.  HT 15:3-6.
6        Cpl. Carpenter pulled onto SR-80 and began to catch up to the vehicle.  HT 15:7-9.
7    When he caught up, he was able to run the temporary registration.  HT 15:15-16.  He found
8    the registration matched the vehicle, though without the driver's ID he could not match the
9    registration to the driver.  HT 15:17-19, 45:9-11.   He followed behind the vehicle as it
10   took the 303 onramp onto westbound I-10 from SR-80.  HT 17:18-19.[1]
11       At the time of these events, westbound I-10 had two lanes of travel from onramp
12   303 before opening to three lanes beyond milepost 303.  HT 34:13-18; Government's
13   Exhibit E; Defendant's Exhibit I.  After these events, the two-lane stretch was widened to
14   three lanes.  HT 19:4-10; Gov. Ex. E; Def. Ex. I.  Arizona Department of Transportation
15   reported the third lane was added to a length of 0.61 miles extending from onramp 303
16   located at milepost 303.56.  HT 66:10-21, 75:16-18, Gov. Ex. E; Def. Ex. I.
17       Cpl. Carpenter activated his body worn camera ("BWC").  HT 16:6-15.  The BWC
18   was attached at Cpl. Carpenter's chest and did not capture the vehicle traveling in Benson
19   or the alleged traffic violation.  HT 16:11-15, 52:20-22.
20       Under A.R.S. § 28-721(A), a person is required to drive on the right half of a
21   roadway of sufficient width except when passing or where the right half is closed, the road
22   has three lanes or the road is posted for one-way traffic.  Cpl. Carpenter testified that, as
23   he followed behind the vehicle, he saw the vehicle merge from onramp 303 directly into
24   the left lane of the two-lane I-10 and travel in the left lane for the entire two-lane stretch,
25   and he followed behind.  HT 17:11-19, 18:17:19, 19:1-3, 59:21-23.  According to Cpl.
26   Carpenter, there was no other traffic and no obstacles to prevent the vehicle from traveling
27   in the right lane.  HT 17:19-24.  Cpl. Carpenter testified he determined the driver had

---

[1] From Google maps, SR-80 and Ocotillo Road to the 303 onramp is about a mile.

1 violated A.R.S. § 28-721(A) by traveling in the left lane of the two-lane highway. HT 18-4:5.

Cpl. Carpenter initiated the traffic stop just before the 302 westbound offramp. HT 17:25, 18:12-14, 42:2-7. The vehicle came to a stop in the gore area just west of the 302 westbound onramp. HT 18:20-25, 20:2-21:2 & Exhibit H-1.

Cpl. Carpenter approached the vehicle on the passenger side. HT 21:5-6. He testified he saw five people in the vehicle, the driver, a front passenger and three back passengers. HT 21:5-8. The BWC footage shows that Cpl. Carpenter shined his flashlight in the rear passenger area. Government's Exhibit A, Defendant's Ex. M, ("BWC") at 1:29. Cpl. Carpenter testified he saw the back passengers asleep or attempting to appear asleep. HT 21:6-11, 26:25-27:7. According to Cpl. Carpenter, faking sleep is a tactic illegal aliens use to avoid interaction with police. HT 25:12-21.

Cpl. Carpenter spoke with the front passenger and driver through a partially open front-passenger window. BWC at 1:31. Upon contact, he told them "the reason I pulled you over is you were traveling in the left lane … the left lane is for passing, the right lane is for travel." *Id.* 1:34. He asked for the driver's license, registration and proof of insurance. *Id.* 1:39. Within about 12 seconds of contact, he asked the driver to step out of the vehicle and follow him back to his patrol vehicle. *Id.* 1:30-1:42.

Cpl. Carpenter testified he suspected alien smuggling, based on: (1) the vehicle riding lower in the back, indicating potential overload, (2) the temporary tag, which he testified is a tactic smugglers use to hide their identity, (3) the vehicle moving directly into the leftmost lane from the onramp, indicting "a bit of avoidance of the police presence" behind her (4) the vehicle traveling 65 miles per hour, slower than the 75 mile per hour limit people usually drive on that area of I-10, which he testified can be an avoidance tactic, (5) the back passengers appearing to pretend-sleep, a tactic illegal aliens use to avoid police interaction, and (6) the use of SR-80 onto I-10, a smuggling route from the border through Benson and on to Tucson and Phoenix. HT 24:11-25:21, 46:18-20, 61:6-12.

The driver stood as instructed near the front passenger-side tire of the patrol vehicle.

BWC 2:12. Cpl. Carpenter immediately radioed for dispatch to call Border Patrol to the scene. HT 24:6-18; BWC 2:19. Cpl. Carpenter asked the driver whether the vehicle belonged to her, where she was headed and where she was coming from. BWC 2:34. The driver asked why she was pulled over, and Cpl. Carpenter explained she was stopped because "when [she] got on the interstate" she traveled in the left lane. BWC 2:54. In response, the driver said "yeah I was gonna pull. …" BWC 3:06. Cpl. Carpenter told her "you were required to move over to the right," and she responded "yeah. …" BWC 3:10.

Cpl. Carpenter then asked how many people were in the vehicle, whether anyone was in the trunk and whether any weapons were in the vehicle. BWC 3:15. Dispatch radioed that Border Patrol agents were on their way. BWC 4:28. Cpl. Carpenter asked the driver, "did you know that the people in the car are illegal?" BWC 4:40. Cpl. Carpenter acknowledges that, when he asked the question, he did not know whether the passengers were illegal aliens. HT 48:17-20, 49:14-15. He had not spoken with the back passengers or requested or received their IDs. HT 48:2-5. Nor had he given the driver the *Miranda* warnings before asking the question. HT 48:21-49:8. He had not yet received the driver's ID or checked it against the registration, and had not yet started on a traffic citation because he was focused on an alien-smuggling investigation. HT 44:22-45:1, 46:18-20, 49:16-23, 50:1-10, 55:19-56:7. Cpl. Carpenter advised the driver she was not free to leave because he suspected alien smuggling. BWC 5:48.

The driver remained at the patrol vehicle with another police officer who had arrived at the scene. BWC 5:53. Cpl. Carpenter walked to the suspect vehicle and asked the front passenger to step out of the vehicle. BWC 6:18. The front passenger stepped out and left the door open, and the two spoke near the open door. BWC 6:24. Cpl. Carpenter asked her whether there were any weapons on her, whether there were any drugs in the vehicle, where they were headed, where they were coming from, who the people in the vehicle were, and whether anyone was in the trunk. BWC 6:25.

Through the open door, Cpl. Carpenter shined his flashlight into the vehicle and spoke to the back passengers. BWC 7:36. He asked for their IDs. BWC 7:37. On the

BWC footage, the driver's side rear passenger can be seen with his eyes closed and his head resting against the door. BWC 7:39. No response is heard from the passengers on the BWC. The driver's side rear passenger remained with his eyes closed and his head against the door. BWC 7:40.

According to Cpl. Carpenter, Border Patrol agents arrived five to ten minutes after he contacted police dispatch. HT 25:22-25. The first appearance of a Border Patrol agent on the BWC footage is five minutes and 31 seconds after that call. BWC 7:50. As the passenger-side rear passenger interacted with police, with the back door now open, the middle passenger can be seen on the BWC footage with his eyes closed and his head slightly back. BWC 8:00.

Cpl. Carpenter told a Border Patrol agent that "they all say there's nobody in the trunk but it's pretty low." BWC 8:05. With other officers and Border Patrol agents at the suspect vehicle, Cpl. Carpenter returned to his patrol vehicle where the driver remained. BWC 8:20. A Border Patrol officer confirmed to Cpl. Carpenter that two of the passengers were undocumented and no one was found in the trunk. BWC 11:12. Cpl. Carpenter told the driver that two of the passengers were undocumented. BWC 12:18. He told her, "I'm going to write you a … warning for traveling in the left lane … and then Border Patrol is going to do whatever they're going to do … whether they charge you and take you tonight or if they cut you guys loose. …" BWC 12:28.

After the driver was arrested on suspicion of alien smuggling, Cpl. Carpenter began writing up a warning for violation of A.R.S. § 28-721(A), failing to drive on the right half of the roadway. HT 50:7-10; Government's Exhibit J; Defendant's Exhibit A. He issued a warning as opposed to a citation. HT 28:18-23. A warning requires no action by the driver, whereas a citation requires the driver to pay a fine or resolve the matter in court. HT 28:20-23. According to Cpl. Carpenter, he could have issued a citation or warning for merging directly from the onramp to the left lane but in his discretion chose not to do so. HT 28:24-29:11, 58:21-59:1. When asked by a backup officer about the possibility of a citation relating to the cover on the temporary registration tag, Cpl. Carpenter responded,

1   "just need the one, and if BP didn't need it, I wouldn't be doing it." HT 51:3-10.

2   Cpl. Carpenter wrote a report of the matter on the same day. HT 32:2-4; Government's Exhibit K; Defendant's Exhibit C. The report does not include any reference to the temporary registration tag, the vehicle being heavily laden or the passengers appearing asleep. HT 32:5-21; Gov. Ex. K; Def. Ex. C.

On April 3, 2025, more than five months after the stop, Cpl. Carpenter met with an Assistant United States Attorney and a Border Patrol agent. HT 27:14-17. The purpose of the meeting was for Cpl. Carpenter to provide more information about the stop. HT 27:18-23. After the meeting, Cpl. Carpenter issued a more detailed narrative. HT 27:24-28:1, 51:23-52:11; Gov. Ex. L; Def. Ex. C. The later report included the temporary registration tag, the vehicle being heavily laden and Cpl. Carpenter's observations at the scene, none of which was in the original report. HT 28:2-5, 32:22-33:3; 39:16-25.

In connection with this matter, Defendant's private investigator, Raymundo Pacheco, re-created the drive from SR-80 onto the westbound 303 onramp and onto I-10 to the area of the stop. HT 64:21-23; 66:22-24. He drove the length three or four times on April 23, 2025, after the road-widening project was completed. HT 66:25-67:4. Mr. Pacheco confirmed that, at 64 to 67 miles per hour, it took him 24 to 26 seconds to drive the length that used to be two lanes. HT 68:4-70:22.

**Motion To Suppress**

In support of the traffic stop, the Government cites Cpl. Carpenter's observations of the alleged lane violation, that the vehicle traveled in the left lane for the full length of the two-lane stretch beginning from onramp 303. In support of the alien-smuggling investigation, the Government cites Cpl. Carpenter's conclusion that the facts indicated alien-smuggling in this high-smuggling area, particularly (1) the vehicle was traveling on SR-80 onto I-10, a common smuggling route from the border, (2) the temporary registration tag, a tactic used by smugglers, (3) the vehicle was riding lower in the back than the front, suggesting a possible payload, (4) the vehicle merged into the left lane directly from the onramp, indicating avoidance of the officer following behind, (5) the vehicle traveled well

- 7 -

below the speed limit, also an indication of avoidance, and (6) the back passengers appeared to be faking sleep, an avoidance tactic used by illegal aliens. Defendant argues, based on the contemporaneous police report and information from the scene, reasonable suspicion did not exist for the stop and subsequent alien-smuggling investigation.

### Reasonable Suspicion Standard

A law enforcement officer may make a stop consistent with the Fourth Amendment if there is reasonable suspicion to believe unlawful activity may be afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). Reasonable suspicion exists when specific facts, together with rational inferences drawn from them, warrant a suspicion of unlawful activity. *United States v. Cortez*, 449 U.S. 411, 416-19 (1981); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity").

Reasonable suspicion is more than a "hunch," but it is a low bar and does not require probable cause. *Arvizu*, 534 U.S. at 274. Reasonable suspicion requires considerably less indication of wrongdoing than that required to satisfy the preponderance of evidence standard. *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The court is to consider the totality of the circumstances that confronted the officer at the time of the stop. *Sokolow,* 490 U.S. at 8; *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). The assessment precludes a "divide-and-conquer analysis" because, though each of the suspect's acts may be innocent, when taken together under the circumstances they may warrant further investigation. *Arvizu,* 534 U.S. at 274. "A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Valdes-Vega,* 738 F.3d at 1078-79 (quoting *Arvizu,* 534 U.S. at 277).

The facts underlying reasonable suspicion must be measured against an objective reasonableness standard. *Gonzalez-Rivera v. I.N.S.,* 22 F.3d 1441, 1445 (9th Cir. 1994). However, an officer is "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975). An officer's training and experience may be considered in his or her assessment of the facts

so long as inferences drawn are objectively reasonable, and the court is to give such reasonable inferences "due weight." *Arvizu*, 534 U.S. at 273, 277; *see also Cortez*, 449 U.S. at 418; *United States. v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000).

With respect to alien-smuggling, the totality of circumstances may include but are not limited to: (1) the characteristics of the area where the vehicle is encountered; (2) the vehicle's proximity to the border; (3) usual patterns of traffic and time of day; (3) patterns and information about previous drug or human smuggling in the area; (4) whether certain types of vehicles are frequently used to transport contraband or undocumented people; (5) erratic behavior on the part of the driver or attempts to evade law enforcement; and (6) whether the vehicle is heavily loaded or has an unusual number of passengers. *Brignoni-Ponce*, 422 U.S. at 884-85. "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion ... [a]nd the facts must be filtered through the lens of the agents' training and experience." *Valdes-Vega,* 738 F.3d at 1079.

When an officer conducts a traffic stop with reasonable suspicion, an investigation of the suspected violation is justified. *Rodriguez v. United States,* 575 U.S. 348, 354 (2015). If, in the course of investigating the initial reason for the stop, the officer obtains reasonable suspicion of additional unlawful activity, the officer may prolong the stop to investigate that suspected unlawful activity. *United States v. Evans,* 786 F.3d 779, 788 (9th Cir. 2015). Where reasonable suspicion exists, an officer's subjective ulterior motives for the stop, if any, are irrelevant. *Whren v. United States,* 517 U.S. 806, 813-14 (1996).

Absent reasonable suspicion, all evidence seized as a result of the unjustified law enforcement action must be suppressed as fruit of the poisonous tree. *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001).

**Discussion**

The court finds reasonable suspicion for the traffic stop. Cpl. Carpenter testified he observed the vehicle travel in the left lane from the time it entered I-10 from the 303 onramp through the entire two-lane stretch. The violation as articulated by Cpl. Carpenter was more than *de minimis.* The two-lane stretch was approximately a half-mile and would

have taken approximately 25 seconds to traverse at the speed the vehicle was traveling, as confirmed by the ADOT road widening materials and testimony of Mr. Pacheco.

The court also finds reasonable suspicion for the alien-smuggling investigation. At the time he asked the driver to exit the vehicle, Cpl. Carpenter had observed a heavily laden vehicle with a temporary registration tag traveling at night in a high-smuggling area along a common smuggling route from the border, all indicators of alien smuggling in Cpl. Carpenter's training and experience. The vehicle appeared to be engaged in what Cpl. Carpenter testified was, in his experience, avoidance behavior, traveling well below the speed limit. Upon contact with the occupants, Cpl. Carpenter observed three adult backseat passengers appearing to be asleep, despite the vehicle having stopped and Cpl. Carpenter shining his flashlight in the backseat area and despite the front occupants speaking with Cpl. Carpenter through an open window. Cpl. Carpenter testified that faking sleep is a tactic illegal aliens use to avoid interaction with police. Taken together and viewed in the context of the SR-80 corridor and Cpl. Carpenter's experience, the circumstances reasonably indicated alien smuggling sufficient to conduct an investigation.

Though the vehicle was stopped for a suspected traffic violation, an alien-smuggling investigation was appropriately initiated upon contact with the vehicle's occupants. Cpl. Carpenter immediately radioed for Border Patrol assistance, and Border Patrol agents arrived approximately five minutes later. There is no indication that the investigation was excessively protracted.

As Defendant argues, there are reasons to question Cpl. Carpenter's testimony. The traffic warning lists the "location description" as milepost 302, where I-10 was three lanes and thus, if the reference is to where the lane violation occurred, could not be a basis for a violation under A.R.S. § 28-721(A). Cpl. Carpenter's initial report similarly indicates an "address" of milepost 302 of westbound I-10. The initial report contains none of the factors cited to support reasonable suspicion for an alien-smuggling investigation. It was not until after Cpl. Carpenter met with an AUSA and Border Patrol agent five months later that Cpl. Carpenter issued his supplemental report explaining why he suspected alien smuggling.

1  Defendant also cites Cpl. Carpenter's statement that he would not be issuing a traffic
2  warning if Border Patrol did not need it, that a traffic warning does not give the driver an
3  opportunity to contest the alleged violation, as does a citation, and that a warning does not
4  contain the officer's certification that the information is correct, as does a citation (HT
5  31:21-31:1).  Citing these facts, and that Cpl. Carpenter did not give the *Miranda* warnings
6  before questioning the driver about alien smuggling, Defendant argues the information
7  cited by Cpl. Carpenter to support the stop and investigation are post-hoc rationalizations.[2]

The court finds these matters are not determinative in this case.  First, Cpl. Carpenter testified convincingly about the events.  Second, the body worn camera footage corroborates Cpl. Carpenter's testimony.  The driver affirmed Cpl. Carpenter's statement that she drove in the left lane when she entered the freeway, responding "yeah I was gonna pull [over]. …"  When he told her she was required to move over to the right lane, she responded "yeah."  Also on the BWC footage, the vehicle has a temporary registration tag (BWC 16:00) and, judging from the wheel gaps of the passenger-side tires, was lower in the back than the front (BWC 1:25), both of which an experienced officer would have noticed.  The BWC footage shows Cpl. Carpenter shining his flashlight into the backseat area when he first approached the vehicle and, as he does so, the driver's side passenger is seen with his eyes closed and his head against the door as if asleep, all confirming Cpl. Carpenter's testimony that he observed the passengers appearing to be asleep.  Later in the BWC footage, the middle passenger is shown with his eyes closed and his head in a resting position, further corroborating what Cpl. Carpenter testified he saw when he first approached the vehicle.  Cpl. Carpenter is heard on the BWC footage discussing with a Border Patrol agent that the vehicle was low in the back and that there could be people in the trunk, further supporting his testimony regarding the events.

Citing *State v. Livingston,* 206 Ariz. 145, 75 P.3d 1103 (App. 2003) and *State v. Alvarez-Soto,* 258 Ariz. 417, 559 P.3d 642 (App. 2024), review granted (May 6, 2025), Defendant argues that driving approximately 25 seconds in the left lane is *de minimis* and

---

[2] Defendant does not raise a *Miranda* issue on the pending motion.  The court makes no determination regarding any alleged *Miranda* violation.

- 11 -

thus cannot be a reasonable basis for a lane violation under A.R.S. § 28-721(A). The court finds that, in this case, driving in the left lane for approximately 25 seconds for the full half-mile length of the two-lane roadway with a vehicle behind where there is no impediment to driving in the right lane, after having committed to the left lane by merging directly into the left lane from the onramp instead of following the onramp into the right lane, is more than *de minimis*. *See, e,g., Livingston,* 206 Ariz. at 147, 75 P.3d at 1105 (*de minimis* where right-side tires crossed the white shoulder line on one occasion); *Alvarez-Soto,* 258 Ariz. at 421, 559 P.3d at 641 (deciding "whether drivers on Arizona's highways are compelled by § 28-721(B) to move from the middle lane to the right lane if they are passed by a lone vehicle on the right when the state has failed to elicit any testimony as to the speed of that vehicle").

The court finds, based on the totality of the circumstances, that reasonable suspicion existed for the traffic stop and subsequent alien-smuggling investigation.

**Recommendation**

For the foregoing reasons, the Magistrate Judge recommends that the District Judge, after an independent review, deny the Motion to Suppress [Doc. 46].

The parties may file and serve written objections within 14 days of this Report and Recommendation. If objections are not timely filed, the party's right to *de novo* review may be waived.

Dated this 25th day of September 2025

Honorable Michael A. Ambri
United States Magistrate Judge

- 12 -