**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-24-08211-001-TUC-RM (MAA) |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Venicia Monique Bohn, | |
| Defendant. | |

On September 29, 2025, Magistrate Judge Michael A. Ambri issued a Report and Recommendation ("R&R") (Doc. 71), recommending that this Court deny Defendant's Motion to Suppress Evidence (Doc. 46). On October 10, 2025, Defendant filed an Objection (Doc. 73) and on October 23, 2025, the Government filed a Response to the Objection (Doc. 75). For the following reasons, the Court will overrule the R&R and grant Defendant's Motion to Suppress Evidence.

**I.    Background**

On October 21, 2024, at around 9:00 p.m., Corporal Nicholas Carpenter of the Benson Police Department conducted a traffic stop of a vehicle traveling west on Interstate 10 ("I-10"), near mile marker 302. (Doc. 65 at 18.) Corporal Carpenter had first seen the vehicle as it traveled toward I-10 on State Route 80, passing by the intersection of Ocotillo Road and State Route 80 in Benson, Arizona, where Corporal Carpenter was parked observing traffic. (*Id.* at 14.) From Benson, State Route 80 runs north/south toward the border between the United States and Mexico. (*Id.*) Corporal Carpenter describes the

1    Benson area as a "hotbed" for human smuggling efforts, in part because of the connection
2    to the border provided by State Route 80. (*Id.* at 13.) However, thousands of people drive
3    through the Benson area each day because of its position along I-10—a main thoroughfare
4    in Arizona—and of course, not all of them are engaged in illegal activity. (*Id.* at 57.)

5    At a hearing conducted before Magistrate Judge Ambri on August 26, 2025, Corporal Carpenter stated that when he first saw the vehicle he eventually pulled over, the characteristics that caught his attention were that the vehicle had a temporary license plate and that its rear was apparently lower than its front. (*Id.* at 15.) In Corporal Carpenter's experience, a temporary license plate can indicate that the driver of the vehicle is trying to hide his or her true identity; in addition, the rear being lower than the front can indicate that there are more occupants of the vehicle than is typical. (*Id.* at 15, 24.) After having made these observations, Corporal Carpenter decided to follow the vehicle and check its registration. (*Id.* at 15.) The registration matched the vehicle. (*Id.*)

Corporal Carpenter continued following the vehicle as it traveled onto the on-ramp from State Route 80 to I-10. (*Id.* at 17.) As it entered the westbound I-10 near the 303 mile marker, the vehicle went into the left-hand lane of travel. (*Id.* at 18.) At that point, prior to construction which opened the entirety of the relevant section of I-10 into three lanes, the vehicle was traveling along a portion of the roadway between mile markers 302 and 303 which contained only two lanes. (*Id.* at 19.) The distance from where the on-ramp near the 303 mile marker connected with I-10 to where I-10 opened into three lanes was about 0.4 or 0.5 miles. (*Id.* at 66.) The I-10 is a divided highway, with lanes for eastbound and westbound travel that are separated by an intervening space.[1]

Corporal Carpenter testified that he determined the vehicle had engaged in a traffic violation by remaining in the left-hand lane while traveling that 0.4 or 0.5 mile stretch where I-10 had only two lanes. A.R.S. § 28-721(A) requires a person to drive on the right half of a roadway of sufficient width subject to certain exceptions, such as where the

---

[1] The Court takes judicial notice of the separated eastbound and westbound lanes, as they are clearly visible on a map of the area where Ms. Bohn was stopped. *See* Fed. R. Evid. 201; *see also* Benson, Arizona, GOOGLE MAPS, http://maps.google.com.

1  roadway has three lanes, and where the roadway is designated for one-way traffic. Corporal
2  Carpenter explained that there appeared to be nothing preventing the vehicle from traveling
3  in the right-hand lane. (*Id.* at 17.) Therefore, Corporal Carpenter initiated a traffic stop, and
4  the vehicle came to a halt next to the westbound on-ramp near mile marker 302. (*Id.* at 18.)
5  At the location where the vehicle stopped, I-10 had already expanded into three lanes. (*Id.*)

6  Corporal Carpenter approached the vehicle from the passenger side, briefly
7  explained through the window why he had stopped the car, and saw three people in the
8  backseat that were "asleep or attempting to appear asleep." (*Id.* at 21.) He testified that in
9  his experience, such behavior could indicate a desire to avoid contact with law
10 enforcement. (*Id.* at 25.) He also testified that when he initiated the traffic stop, the vehicle
11 was traveling at around sixty-five miles per hour, whereas the posted speed limit on the
12 relevant section of I-10 was seventy-five miles per hour, and that in his experience this
13 could also indicate a desire to avoid contact with law enforcement. (*Id.*) Based upon these
14 conclusions and his previous observations about the temporary registration and apparent
15 heavy burden of the vehicle, upon returning to his patrol car—accompanied by Defendant
16 Bohn, the driver of the vehicle—Corporal Carpenter immediately radioed dispatch and
17 requested that Border Patrol be called to the scene. (*Id.* at 24.)

18 Standing at the passenger side of his patrol car, Corporal Carpenter explained to Ms.
19 Bohn in greater detail the traffic violation he had pulled her over for, questioned where she
20 had come from, what her destination was, and whether the vehicle belonged to her. (*Id.* at
21 45-46.) Corporal Carpenter then received confirmation via radio that a Border Patrol unit
22 was on its way. (*Id.* at 47.) After hearing this, Corporal Carpenter asked Ms. Bohn, "Do
23 you know the people in the car are illegal aliens?" (*Id.*) At the hearing conducted before
24 Magistrate Judge Ambri on August 26, 2025, Corporal Carpenter admitted that this
25 question was a guess and that at the time he had no definite knowledge upon which to base
26 a statement that the people in the vehicle were undocumented. (*Id.* at 48-49.) After asking
27 this question, Corporal Carpenter closed his computer, walked back to Ms. Bohn's vehicle,
28 and began requesting identification from the vehicle's passengers. (Government's Exhibit

1  A, Defendant's Exhibit M at 4:47.)

2  Corporal Carpenter's body-worn camera footage shows that Border Patrol agents arrived about five minutes after Corporal Carpenter requested that his dispatch call them to the scene. (*Id.* at 7:50.) Within another five minutes, Border Patrol agents had confirmed that two of the four passengers in the vehicle were undocumented. (*Id.* at 11:12.) In the course of discussion about how to proceed regarding the people in the stopped vehicle, Corporal Carpenter stated, "Cochise County's not doing anything with them." (*Id.* at 11:07.) Later on, when issuing the written warning for traveling in the left lane, Corporal Carpenter further stated, "If BP didn't need it, I wouldn't be doing it." (*Id.* at 26:44.) After confirmation that two passengers in the vehicle were undocumented, and after the issuance of the written warning, Border Patrol agents arrested Ms. Bohn and codefendant Debbie Ann Valle, a passenger in the front seat of Ms. Bohn's vehicle. (Doc. 1.)

Corporal Carpenter's initial written report regarding these incidents is dated October 21, 2024—the same night. (Doc. 65 at 32.) That initial report was very brief, containing no specific details about the alleged traffic violation, Corporal Carpenter's observations regarding the registration tag, or the apparent heavy burden of the vehicle. (*Id.* at 32.) It was not until an April 3, 2025 meeting with a Border Patrol agent and counsel for the United States where Corporal Carpenter was "asked to provide additional explanation for the stop" that Corporal Carpenter clarified in an supplemental report that the alleged traffic violation had occurred just before mile marker 302, where I-10 was two lanes, and provided details regarding the characteristics of the vehicle that aroused his suspicion. (*Id.* at 53.) Since it was positioned at chest height, Corporal Carpenter's body-worn camera did not capture footage of the alleged traffic violation, and Ms. Bohn's vehicle is not visible in the video until Corporal Carpenter exits his patrol car to speak to her and her passengers. (*See* Government's Exhibit A, Defendant's Exhibit M.)

In July 2025, about eight months after Ms. Bohn's arrest, Corporal Carpenter videotaped himself recreating the drive along I-10 that led to Ms. Bohn being stopped on the traffic violation of traveling in the left lane on a two-lane road. (Doc. 65 at 37.) Corporal

Carpenter estimated the time he believed Ms. Bohn had been in violation of A.R.S. § 28-721(A) at 21 seconds. (*Id.* at 38.) Similarly, in April 2025, Defendant's private investigator Raymundo Pacheco also videotaped himself test-driving the distance where I-10 was formerly two lanes, recreating Ms. Bohn's drive at various speeds—65, 67, and 64 miles per hour. (*Id.* at 73.) Each time, it took Mr. Pacheco between 24 and 26 seconds to traverse the distance where Corporal Carpenter believed Ms. Bohn had been in violation of A.R.S. § 28-721(A). (*Id.* at 70.)

Judge Ambri's R&R concludes that reasonable suspicion existed for the traffic stop conducted by Corporal Carpenter and that the traffic violation was more than de minimis. (Doc. 71 at 9.) The R&R further concludes that Corporal Carpenter's alien smuggling investigation was appropriately initiated upon seeing the three occupants in the back seat appearing to fake sleep, since Corporal Carpenter had already observed factors such as the vehicle's temporary registration tag, apparent heavy burden, and slower than expected speed—all in the context of the relevant portion of I-10 being a common route for human smuggling efforts. (*Id.* at 9-10.)

## II.   Standard of Review

A district judge must "make a de novo determination of those portions" of a magistrate judge's "report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation"). Failure to object to the findings and recommendations of the magistrate judge "waives a party's right to review." Fed. R. Crim. P. 59(b)(2).  A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III.   Discussion

In her Objection to the R&R, Ms. Bohn contends that there was no reasonable suspicion to support Corporal Carpenter's traffic stop because Ms. Bohn's violation of A.R.S. § 28-721(A) was de minimis. (Doc. 73.) She further argues that Corporal Carpenter

lacked reasonable suspicion to support his subsequent alien smuggling investigation. (*Id.*) Finally, she asserts that neither Corporal Carpenter's testimony about the reasons for the traffic stop nor his testimony about the reasons for the subsequent alien smuggling investigation should be deemed credible, because Corporal Carpenter did not provide a detailed report of the incident until months after the fact. (*Id.*) In its Response, the Government argues that there was reasonable suspicion to support both the traffic stop and the alien smuggling investigation, and that Corporal Carpenter's testimony is reliable. (Doc. 75.)

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citations omitted). An officer is permitted to initiate a brief investigative traffic stop when he has reasonable suspicion to believe that a traffic violation has occurred. *See Kansas v. Glover*, 589 U.S. 376, 380 (2020). If an officer extends the duration of a traffic stop to conduct an unrelated investigation, he must have independent reasonable suspicion of another crime. *Rodriguez v. United States*, 575 U.S. 348, 349 (2015). The exclusionary rule mandates that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (*citing Mapp v. Ohio*, 367 U.S. 643, 654 (1961)). "This prohibition applies as well to the fruits of the illegally seized evidence." *Id.* (*citing Wong Sun v. United States*, 371 U.S. 471, 485 (1963)).

The Court will analyze the two main arguments proffered by Ms. Bohn—first, that Corporal Carpenter lacked reasonable suspicion for the traffic stop, and second, that Corporal Carpenter lacked reasonable suspicion for the immigration investigation—in turn. The Court finds that Corporal Carpenter's testimony regarding these events is reliable in light of the corroboration provided by his body-worn camera footage.[2]

---

[2] For example, even though Corporal Carpenter's detailed report of Ms. Bohn's traffic stop was not written until April 3, 2025, he can be heard in the body-worn camera footage telling Border Patrol agents that he thought the rear of the car was lower than its front, a detail that did not appear in his initial report. And even though the body-worn camera did not

- 6 -

### a. Traffic Stop

As discussed above, Judge Ambri's R&R concludes that Corporal Carpenter's traffic stop was lawful because Ms. Bohn violated A.R.S. § 28-721(A), and her violation was more than de minimis. (Doc. 71 at 9.) In their Objection and Response, respectively, Ms. Bohn and the Government contest only whether Ms. Bohn's violation was de minimis. (*See* Docs. 73, 75.) This issue need not be addressed, however, because applying the plain language of the statute, the Court concludes that Ms. Bohn did not violate A.R.S. § 28-721(A), and Corporal Carpenter's traffic stop was therefore unconstitutional. If an officer makes a mistake of law and conducts a traffic stop based upon facts that do not amount to a violation, "his suspicions cannot be reasonable," and such a stop violates the Fourth Amendment. *United States v. Mariscal*, 285 F.3d 1127, 1130 (9th Cir. 2002).

A.R.S. § 28-721(A) provides that "[o]n all roadways of sufficient width, a person shall drive a vehicle on the right half of the roadway," subject to certain exceptions, including "[o]n a roadway designated and signposted for one-way traffic." A "'roadway' means that portion of a highway that is improved, designed, or ordinarily used for vehicular travel[.]" A.R.S. § 28-601(22). "If a highway includes two or more separate roadways, roadway refers to any such roadway *separately* but not to all such roadways collectively." *Id.* (emphasis added). A.R.S. § 28-731, entitled "Driving on divided highways," contemplates that "[i]f a *highway is divided into two roadways* by leaving an intervening space . . . a person shall drive a vehicle only on the right-hand roadway." (emphasis added).

Here, the section of I-10 where Ms. Bohn was stopped by Corporal Carpenter is a divided highway; there is an intervening space between the eastbound and westbound lanes.[3] The eastbound and westbound lanes therefore constitute two separate roadways, each designated for one-way traffic. Since a roadway designated for one-way traffic is excepted from the requirements of A.R.S. § 28-721(A), Corporal Carpenter's application of the statute was contrary to law, and he lacked reasonable suspicion to premise his traffic

---

capture video of Ms. Bohn's vehicle before Corporal Carpenter made his traffic stop, Ms. Bohn can be heard agreeing with Corporal Carpenter that she was driving in the left-hand lane of I-10 before he pulled her over.
[3] *Supra* note 1.

- 7 -

stop upon a purported violation of A.R.S. § 28-721(A).[4] As such, Corporal Carpenter's traffic stop violated Ms. Bohn's Fourth Amendment rights, and all evidence procured from her and her vehicle as a result must be suppressed.

### b. Immigration Investigation

Even if Corporal Carpenter's traffic stop had been constitutionally justified at its inception, the traffic stop was unconstitutionally prolonged without reasonable suspicion in violation of Ms. Bohn's Fourth Amendment rights. *United States v. Steinman*, __ F.4th __, No. 23-1703, 2025 WL 3180282 at *6 (9th Cir. Mar. 5, 2025) (if a traffic stop was appropriately made, a reviewing court must analyze if the stop was prolonged and, if so, whether the prolongation was supported by reasonable suspicion).

### 1. The Traffic Stop was Prolonged

Absent independent reasonable suspicion of wrongdoing, an officer may not extend the duration of a traffic stop with tasks unrelated to either the mission of addressing the traffic violation which warranted the stop, or officer safety. *United States v. Landeros*, 913 F.3d 862, 866 (9th Cir. 2019); *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015). "Determining whether to issue a traffic ticket," "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are all related to the mission of the traffic stop. *Rodriguez v. United States*, 575 U.S. 348, 349 (2015). Conducting a criminal history check on a driver is permissible as a precaution for officer safety. *Steinman*, 2025 WL 3180282 at *9. In contrast, "[a] demand for a passenger's identification is not part of the mission of a traffic stop" and is, "if anything, 'inversely related to officer safety.'" *Landeros*, 913 F.3d at 866 (*quoting Evans*, 786 F.3d at 787).

Here, Corporal Carpenter—and subsequently, Border Patrol agents—prolonged the duration of Ms. Bohn's traffic stop with an immigration investigation that was entirely

---

[4] Pursuant to A.R.S. § 28-721(B), on all roadways, "a person driving a vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall drive the vehicle in the right-hand lane then available for traffic . . . except when overtaking and passing another vehicle . . . or when preparing for a left-turn . . . ." The Government does not contend that Corporal Carpenter had reasonable suspicion to stop Ms. Bohn for a violation of A.R.S. § 28-721(B).

unrelated to the purported traffic violation Ms. Bohn was pulled over for. Just a little over two minutes after initiating contact with Ms. Bohn, Corporal Carpenter asked her whether she knew that the people in the backseat of her car were illegal. Just a few seconds after that, Corporal Carpenter shut his computer, abandoning his work on verifying the vehicle information provided by Ms. Bohn, and began requesting identification from the vehicle's passengers—behavior that the Ninth Circuit has established is neither within the scope of a traffic stop nor related to the interests of officer safety. And of course, once Border Patrol agents arrived, their investigation protracted the stop far longer.

### 2. No Reasonable Suspicion Existed

Reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). "Reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (internal quotations and citation omitted). A "mere hunch" is insufficient to establish reasonable suspicion. *Valdes-Vega*, 738 F.3d at 1078. An analysis of reasonable suspicion requires evaluation of the totality of the circumstances. *Arvizu*, 534 U.S. at 273. An officer is permitted to draw upon his experience and specialized training "to make inferences from and deductions about the cumulative information available" *id.*, but "experience may not be used to give officers unbridled discretion in making a stop." *United States v. Jimenez-Medina*, 173 F.3d 752, 754 (9th Cir. 1999).

In the context of alien-smuggling, the totality of the circumstances may include such factors as (1) characteristics of the area; (2) proximity to the border; (3) typical traffic patterns; (4) the officer's prior experience with alien traffic; (5) recent illegal border crossings in the area; (6) erratic or evasive behavior; (7) vehicle characteristics; and (8) behavior of people in the car. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975). The Ninth Circuit has found, for example, that reasonable suspicion of alien smuggling existed where a driver of a rental car appeared to be attempting to avoid a border

patrol checkpoint in an area where there had been an unusually high number of arrests for alien smuggling in the preceding days. *United States v. Garcia-Barron*, 116 F.3d 1305 (9th Cir. 1997); *see also United States v. Palos-Marquez*, 591 F.3d 1272 (9th Cir. 2010) (finding reasonable suspicion where, in an area close to the border, agents received a tip regarding the car that was stopped and observed the car driving extremely erratically). This Court has found that reasonable suspicion existed where an officer observed a minivan close to the border that appeared heavily laden, but the officer could not see passengers or objects that would explain the "sag," therefore suggesting that passengers or contraband were concealed below the minivan's window line. *United States of Am., Plaintiff, v. Sterling Lee Runyon, Defendant.*, No. CR 24-09257-TUC-AMM(EJM), 2025 WL 1678435 (D. Ariz. May 29, 2025), *report and recommendation adopted sub nom. United States v. Runyon*, No. CR-24-09257-001-TUC-AMM (EJM), 2025 WL 1677689 (D. Ariz. June 13, 2025).

"[R]easonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond–Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002). For example, the Ninth Circuit has concluded that no reasonable suspicion existed where a driver was traveling twenty-five miles per hour below the speed limit on a highway known for human smuggling, in a car registered to a Mexican citizen living in an area that had experienced a recent uptick in human smuggling. *Jimenez-Medina*, 173 F.3d at 752. In another instance, the Ninth Circuit concluded that no reasonable suspicion existed where a car driven in an area "notorious" for smuggling appeared heavily laden and the driver glanced at Border Patrol agents several times. *United States v. Rodriguez*, 976 F.2d 592 (9th Cir. 1992); *see also United States v. Lewis*, 295 F. Supp. 3d 1103 (C.D. Cal. 2018) (finding no reasonable suspicion where rental car was driven erratically on highway known for human smuggling but also frequented by many legal residents; therefore, location was of little probative value).

Here, even when considered in their totality, the factors cited by Corporal Carpenter—the vehicle's presence on I-10, its temporary registration tag, apparent "heavy

load," slow speed, and passengers "faking" sleep—are insufficient to form reasonable suspicion justifying the immigration investigation that took place. First, just as in *Lewis*, the fact that Ms. Bohn was driving on I-10 is of little probative value because it is a main thoroughfare in Arizona used by many thousands of people engaged in lawful activities. Corporal Carpenter's observation that Ms. Bohn was on State Route 80 before she entered I-10 is also of limited probative value because State Route 80 stretches for over seventy miles before connecting with the United States-Mexico border. Corporal Carpenter did not assert that he had any reason to believe that Ms. Bohn had recently crossed the border when he summoned Border Patrol to the scene. (*See* Doc. 65.)

Corporal Carpenter's statement that Ms. Bohn's vehicle appeared heavily laden similarly fails to support a finding of reasonable suspicion in light of the fact that that the vehicle *was* heavily laden, but not in violation of the law—as Corporal Carpenter saw, three people, the maximum number allowed, were in the backseat. This clear explanation of why the back of the vehicle may have appeared to sag stands in sharp contrast to cases such as *Runyon*, where an officer observed a low-riding vehicle without any visible passengers or cargo, leading to the inference that something, or someone, was intentionally concealed within. Furthermore, during the evidentiary hearing conducted before Judge Ambri on August 26, 2025, Corporal Carpenter admitted that he saw no dirt, grass, or other potential indicators of illicit travel in remote areas on either Ms. Bohn's passengers or the vehicle itself. (Doc. 65 at 48.)

Ms. Bohn's driving behaviors were also innocuous and do not rise to the level of evasive or suspicious conduct. In his April 3, 2025, supplemental report, Corporal Carpenter described Ms. Bohn's vehicle entering the far-left lane after merging onto I-10 and proceeding at sixty-five miles per hour in an area where the posted speed limit was seventy-five miles per hour. (Doc. 65 at 25.) He testified that this demonstrated, in his opinion, an "avoidance technique." (*Id.*) However, it is unclear why entering the far-left lane would suggest an avoidance of police presence. In addition, proceeding at ten miles below the posted speed limit, especially at night, is also unsuspicious behavior; this

1  deviation from the speed limit is significantly less than the twenty-five mile per hour
2  difference observed by police in *Jimenez-Medina*. The Court is mindful that Corporal
3  Carpenter's experience as an officer is relevant in an evaluation of the reasonableness of
4  his behavior, but as previously discussed, "experience may not be used to give officers
5  unbridled discretion in making a stop." *Jimenez-Medina*, 173 F.3d at 754.

6        Finally, the temporary registration tag on Ms. Bohn's car and the behavior of her
7  passengers—Corporal Carpenter testified that he believed they pretended to sleep when he
8  pulled over Ms. Bohn—also fail to adequately support a finding of reasonable suspicion.
9  Even though temporary registration tags may sometimes be used by criminals seeking to
10 avoid detection, such tags are also consistent with lawful behavior. Furthermore, Corporal
11 Carpenter compared the tag and the vehicle it was attached to before initiating his traffic
12 stop, and found that the tag matched the vehicle. (Doc. 65 at 45.) Similarly, accepting as
13 true Corporal Carpenter's assertion that pretending to sleep is an avoidance tactic (*id.* at
14 25), sleeping in the back of a car, especially at nighttime, is not necessarily indicative of
15 criminal activity, as Corporal Carpenter conceded (*id.* at 58). And when Corporal Carpenter
16 radioed for Border Patrol, he had not yet attempted to initiate contact with the occupants
17 of the backseat; he had merely observed them with their eyes closed. (Government's
18 Exhibit A, Defendant's Exhibit M at 1:30 – 2:20.)

19       It is true that even though a collection of factors considered in isolation from one
20 another may have an innocent explanation, they may collectively amount to reasonable
21 suspicion. *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007).
22 Nonetheless, the Court finds that there was insufficient reasonable, particularized suspicion
23 to warrant Corporal Carpenter's immigration investigation. Altogether, the facts show a
24 car laden with the legal maximum number of passengers; that those passengers were not
25 attempting to conceal themselves; that they were resting in the backseat; and that the driver
26 engaged in no evasive behavior. As discussed above, the vehicle's presence on I-10 and
27 State Route 80, without any indication that it had recently crossed the border, also lacks
28 significant probative value.

As such, the Court concludes that Ms. Bohn's traffic stop was prolonged without reasonable suspicion, in violation of her Fourth Amendment rights. Since the traffic stop was unconstitutional at its inception as discussed in Section III(a), the Court will suppress all evidence obtained from Ms. Bohn and her vehicle, including any statements made by Ms. Bohn. Even if the traffic stop had been valid at its inception, the Court would suppress all evidence obtained following the unconstitutional prolongation of the stop.

Accordingly,

**IT IS ORDERED** that Defendant's Objection (Doc. 73) is **granted**.

**IT IS FURTHER ORDERED** that the Report and Recommendation (Doc. 71) is **overruled**, as set forth herein.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress (Doc. 46) is **granted**, as set forth herein.

Dated this 5th day of December, 2025.

_____
Honorable Rosemary Márquez
United States District Judge